Plaintiff instituted this suit to recover damages alleged to have been caused him by defendant and for a cause of action he filed the following petition:
"1. That C.S. Causey, resident of the Parish of Ouachita, Louisiana, is justly and truly indebted unto your petitioner in the full sum of $2,883.50, with legal interest thereon from date of judicial demand until paid, for all costs of suit, for this, to-wit:
"2. Petitioner avers that on or about April 23, 1941, and prior and subsequent thereto, your petitioner was employed by the Monroe Furniture Company, Ltd., in the capacity of collector of accounts, and that in said occupation your petitioner at all times had enjoyed a reputation of honesty, fairness and courteous treatment of customers upon whom he had occasion to call in the course of his work.
"3. Petitioner avers that on or about April 23, 1941, your petitioner in the normal and usual course of his work and employment and upon the specific instructions of his said employer, did call upon the defendant, C.S. Causey, at the store and place of business of said defendant located at 320 Texas Avenue, Monroe, Louisiana, during the afternoon of said date, at about the middle of the afternoon.
"4. Petitioner avers that he entered the store and place of business of the said defendant, in the usual manner, for the purpose of seeking to make collection on an account due by the said defendant to *Page 87 
the Monroe Furniture Company, your petitioner's employer; that said account, along with other accounts in usual course had been delivered to your petitioner by his employer with instructions to call upon the debtor and make request for payment on said account, it being the instructions of your petitioner and your petitioner's information that said account was a weekly account and that the said Causey was delinquent in his payments due thereon.
"Petitioner avers that at the time alleged, upon entering the store of said defendant, which he had visited on numerous occasions in connection with other business, he found the said C.S. Causey engaged in conversation with a man unknown to petitioner, and deeming the said defendant at the time to be engaged in the pursuit of his own business interests and not wishing to be in any manner discourteous or offensive and not wishing to intrude upon the business affairs of the said C.S. Causey, he, the said petitioner, merely spoke to the said defendant as he entered the store and proceeded to the back of said store where he engaged in casual conversation with other persons then in said store, waiting such time until the said defendant should conclude his business with the man to whom he was talking, and waiting such time until it should appear convenient and appropriate for petitioner to approach the said defendant upon the matter of the desired collection.
"Petitioner next avers that after the man to whom the said C.S. Causey was talking had left defendant's store and at a time when the said C.S. Causey was not otherwise engaged, your petitioner approached said defendant and in a polite and courteous manner stated to defendant the nature and purpose of his call, and requested of the defendant payment to apply on the account due by defendant to the Monroe Furniture Company, Ltd.
"5. Petitioner avers that said defendant thereupon immediately seemed to become annoyed or incensed at the fact that he was being called upon by a collector, and that defendant stated in a very unpleasant manner that such collection call was a reflection upon defendant's credit and that he, defendant, had never agreed to pay his account with weekly installments, but rather on a thirty-day basis.
"6. Petitioner avers that your petitioner further acting and speaking in a most courteous and friendly manner, assured defendant that if defendant wished to call at the store of petitioner's employer and make arrangements or re-arrangements for the handling of his account, your petitioner had no objection or authority to object thereto, but advised said defendant that petitioner simply in the normal course of business had placed with him by his employer the defendant's said account for collection demand and that no offense was meant thereby.
"7. Petitioner avers that defendant, despite these assurances, seemed to become peculiarly obsessed and incensed at the idea that he was being called upon by a collector and proceeded to state in a very unpleasant manner that he would not have anyone treating his account or his credit in such fashion and thereupon suddenly and without warning and without any reason whatsoever for your petitioner to expect any such action, said defendant, C.S. Causey, did grab a hatchet or cleaver apparently for opening packing cases and the like, and did instantly lift same and strike your petitioner on the head and forehead with said instrument, which was thus used in a manner to make it deadly in purpose and effect.
"8. Petitioner avers that said defendant struck your petitioner with all the force of which he was capable with said deadly instrument, and that only by involuntary and instant reaction was your petitioner fortunate enough to elevate his arm to such position as to break said blow, for otherwise petitioner alleges said blow would have broken the skull of your petitioner and in all probability might have killed your petitioner, the said instrument being a sharp and heavy iron weapon.
"9. Petitioner next avers that then and then only, after said C.S. Causey had struck your petitioner, did your petitioner endeavor, in an effort to protect himself, to grapple with the said C.S. Causey in an attempt to wrest from him said weapon, and that in said scuffle said weapon was released from the hand of the said defendant, but in said scuffle the said defendant clawed and scratched at your petitioner and clawed an ugly laceration on your petitioner's neck, causing excessive bleeding from both wounds, to-wit, that on the forehead of petitioner and that on petitioner's neck.
"10. Petitioner avers that thereupon other parties present in the store of defendant succeeded in disengaging the said *Page 88 
C.S. Causey from the scuffle with petitioner and brought said scuffle to an end and your petitioner, within a few minutes thereafter, as soon as he could regain his sense of balance, left the store of the said C.S. Causey in a peaceable manner and has not returned since to the premises thereof.
"11. Petitioner avers that as herein alleged the said defendant, C.S. Causey, did wilfully and maliciously attack petitioner and commit assault and battery upon the body of your petitioner, with apparent intent to kill petitioner, and that said defendant did sorely wound petitioner and endanger the life of your petitioner.
"12. Petitioner avers that said assault, attack and battery were completely without the slightest provocation or instigation on the part of petitioner; that petitioner at all times herein narrated had conducted himself in the most polite and courteous and inoffensive manner, had at all times spoken quietly to the said defendant and had given defendant no occasion whatsoever to attack your petitioner and had in no way threatened or advanced upon the defendant, but that said attack was wholly without warning or without reason to anticipate or expect, and was, as stated, purely wilful and malicious.
"13. Petitioner avers that petitioner was upon the premises of the said defendant, C.S. Causey, as a licensee and implied invitee, with consent and without trespass, and that said defendant, under the law, owed to your petitioner a duty not to injure, assault and batter your petitioner in the manner above stated.
"14. Petitioner avers that at the time of the assault and injury of which complaint is herein made, there were present in the store of the said C.S. Causey numerous other persons known to your petitioner and to whom petitioner was known and had been known for some time, some of said persons being in the store at the time your petitioner entered it, and others coming in said store during the preliminary conversation between petitioner and defendant; and that the assault and attack upon your petitioner subjected him to the greatest embarrassment and humiliation in the presence of said parties and his acquaintances.
"15. Petitioner further avers that since the date of said attack, the injuries and wounds upon petitioner and the consequent bandages thereon, have been extensive and manifest, and that your petitioner has been placed to great humiliation and embarrassment constantly since the date of said attack through the inquiries and questions of his friends and acquaintances and through the necessity of explaining the origin and circumstances of his wounds and injuries, all of which has caused your petitioner the keenest humiliation.
"16. Petitioner avers that following said assault and attack, your petitioner was immediately obliged to consult a physician and secure medical attendance, and that petitioner is still under medical treatment and observation. Petitioner avers that the blow administered by defendant opened the scalp of petitioner on the left forehead, leaving a wound approximately two inches long on petitioner's left forehead below the hair line and clearly visible, which wound will leave a permanent, disfiguring scar upon your petitioner's forehead, together with a marked swelling in the area of the blow which has remained present from the date of said attack to the date hereof.
"17. Petitioner further avers that in addition to the splitting of petitioner's scalp and the laceration of petitioner's neck, your petitioner suffered concussion as a result of the blow and that due to the effects of said blow and the consequent concussion and pain and suffering consequent thereupon, your petitioner was confined to his bed for several days following said attack, upon the advice of his physician, suffering intense pain and constant headache. Petitioner further avers that petitioner still suffers from repeated and severe headaches as a result of said injury, though prior to said injury petitioner did not suffer from headaches whatsoever; and in addition thereto, there is present at this time, with no apparent alleviation or promise of alleviation, suffering from a peculiar feeling of numbness persistent over petitioner's left eye.
"18. Petitioner avers that he has to date incurred and been obliged to pay hospital and medical expenses in the amount of $33.50, as will be proven upon trial hereof, and that petitioner will be entitled to allowance herein of estimated future medical expenses of not less than $100.00, as it is apparent that petitioner will require future treatment by physicians for an indefinite period of time as a result of the injuries and complaints occasioned by said malicious assault.
"19. Petitioner therefore itemizes the damages sustained by him as a result of *Page 89 
said assault and attack and the damages due and owing to petitioner by said defendant, C.S. Causey, as follows:
Laceration of petitioner's forehead and neck; splitting petitioner's forehead ................................ $500.00 Concussion of the brain and constant and continuing headaches and numbness ............................... 750.00 Permanent disfigurement as a result of permanent scar on your petitioner's forehead ........................ 500.00 Pain and suffering ..................................... 500.00 Mental anguish, humiliation and embarrassment .......... 500.00 Present and future medical expenses .................... 133.50 ------- Total $2,883.50
"20. Petitioner avers repeated amicable demand without avail."
Defendant then answered as follows:
"1. The allegations of Paragraph 1 are denied.
"2. The allegations of Paragraph 2 are denied.
"3. Answering the allegations of Paragraph 3, defendant admits that on or about April 23, 1941, plaintiff came to defendant's place of business or store, and attempted to collect on a bill for a bookcase purchased by defendant's wife from the Monroe Furniture Company, Ltd., for the sum of $20.00, and on which she had made a down payment of $5.00, leaving a balance due of $15.00 as will be more fully shown hereinafter, and otherwise the allegations of said Paragraph are denied.
"4. The allegations of Paragraph 4 of plaintiff's petition, as made, are denied.
"5. The allegations of Paragraph 5, as made, are denied.
"6. The allegations of Paragraph 6, as made, are denied.
"7. The allegations of Paragraph 7, as made, are denied.
"8. The allegations of Paragraph 8 are denied.
"Further answering the allegations of Paragraph 8 your defendant shows that he punched the plaintiff with the wooden handle of a hatchet after the plaintiff had abused and insulted your defendant and was at the time in the act of advancing on him with every indication of an intent to do your defendant bodily harm, all as will be more fully hereinafter set forth.
"9. Answering the allegations of Paragraph 9, defendant shows that the plaintiff, after insulting and abusing him in his own place of business and after refusing to comply with defendant's request to peacefully leave the store, in a threatening and ferocious attitude advanced on defendant with the evident intent and purpose of doing your defendant bodily harm, and defendant, in an endeavor to protect himself and in defense of his own person, used the handle of a hatchet, or hammer, to punch the plaintiff, and at the same time plaintiff grabbed him and did attempt to do defendant bodily harm, and because of plaintiff's advantage in age and physical strength was in the act of doing your defendant great bodily harm and was only prevented from doing so by the kindly intervention and peaceful efforts of a bystander who intervened and, through his efforts, caused or forced plaintiff to leave defendant's store, notwithstanding he continued to make an effort to do defendant bodily harm and to threaten and abuse your defendant; otherwise, the allegations of Paragraph 9 are denied.
"10. The allegations of Paragraph 10, as made, are denied.
"Further answering said allegations, your defendant shows that bystanders did prevent further conflict between plaintiff and your defendant, and it was only because of their efforts that plaintiff left defendant's store and that he did so under protest and continued in his efforts to do your defendant bodily harm and continued to abuse and insult defendant; and even after he had reached his car, which was parked in front of defendant's store, opened the door and fumbled in the pocket or compartment of the car and removed his coat and dared your defendant to come out of the store and at that time declared he would do defendant bodily harm in the future, even if he had to catch him away from his place of business. The plaintiff's attitude throughout being most insulting, ferocious and threatening.
"11. The allegations of Paragraph 11, as made, are denied. Defendant shows that his actions were forced as a matter of self-protection and self-defense throughout, and that plaintiff was the aggressor and brought on the entire difficulty, for which there was no just reason or cause on the part of said plaintiff.
"12. The allegations of Paragraph 12 are specifically denied; and, answering the *Page 90 
same, defendant shows that the exact opposite and contrary is true and that plaintiff caused the difficulty and was insulting, threatening and offensive throughout the conversation, and he was not only insulting and offensive to your defendant but he purposely brought on the difficulty and advanced on your defendant without probable cause or reason, notwithstanding defendant was in his own place of business, tending his own affairs and had several times previous to the conflict requested plaintiff to leave defendant's store and place of business, which had been wholly and deliberately ignored and such request refused, followed by plaintiff advancing in a threatening and ferocious manner, as hereinbefore alleged.
"13. Answering the allegations of Paragraph 13, defendant shows that the same are mere conclusions of the pleader and require no answer, but if an answer is required, they are denied.
"14. Answering the allegations of Paragraph 13, defendant admits that there were two or three employees of your defendant in the store at the time of the aforesaid occurrence, and two other persons having business therein, who witnessed and saw the affray which occurred at that time, and which was entirely caused and brought on by the plaintiff herein; otherwise said allegations are denied.
"15. The allegations of Paragraph 15 are denied.
"16. Answering the allegations of Paragraph 16, defendant admits that he broke the skin when he punched plaintiff with the handle of the hatchet, but otherwise the allegations of said plaintiff are denied.
"17. The allegations of Paragraph 17 are denied.
"18. The allegations of Paragraph 18 are denied.
"19. The allegations of Paragraph 19 are denied.
"20. The allegations of Paragraph 20 are admitted.
"Further answering the demands of the plaintiff, your defendant shows that along in the evening of April 23, 1941, or thereabout, the plaintiff in this cause came to your defendant's grocery store, situated on Texas Avenue, in the Town of Monroe, and presented a bill charged by the Monroe Furniture Company to your defendant's wife, Mrs. C.S. Causey, and demanded the immediate payment of the bill, or a dollar at least thereon, and upon being told that your defendant was not in a position to pay the bill at that time, or did not desire to do so, plaintiff in a most insulting manner told your defendant that he should not make contracts which he didn't expect to live up to and that he was sent down there to collect that bill or some amount on it and that he wanted him to pay before he left, or words to that effect.
"Defendant informed plaintiff that he had done business with the Monroe Furniture Company a long time and felt that it would be satisfactory for him to not pay or make payment of said bill at the time and requested plaintiff to call the Monroe Furniture Company and confirm that fact, but the plaintiff refused and continued to demand immediate payment in an insulting and threatening manner.
"Defendant then requested that plaintiff leave his store and place of business, which requests so made were refused and the plaintiff not only remained in defendant's place of business and, in a loud and insulting manner, demanded payment of the bill and insulted defendant, but finally advanced on your defendant in such a manner as to indicate his intention to do him bodily harm, and because of such advance and in self-defense only, your defendant punched the plaintiff on his head with the handle of a hatchet which was lying on the counter nearby when the plaintiff came upon your defendant.
"21. Your defendant shows that he has operated a mercantile business in the City of Monroe for approximately 22 years and has never had any difficulty with his creditors nor with collectors therefor, and that there was no necessity, reason or justification for the plaintiff attempting to force by threats and bodily force a collection of the bill which was made shortly prior to the date of the affray, and that he believes and avers that the true reason for the threatening and insulting manner of plaintiff toward your defendant was the fact that the defendant had previously attempted to get your defendant to hold out of the wages of a colored boy working in defendant's store an amount which plaintiff claimed was due his employer and because defendant refused to do so.
"22. Defendant shows that he is a member of the Police Jury of Ouachita Parish, through the election of voters from his Ward, and that he enjoys a good reputation in his community and in business, and *Page 91 
notwithstanding he has always paid his obligations according to his ability, the plaintiff herein assumed the attitude that one might expect to be assumed against a renegade and dead-beat, all of which attitude and manner was without cause or reason.
"23. Your defendant shows that he is fairly well advanced in age in that he is 64 years of age and is not as active and strong as a man the age of plaintiff at the time of the difficulty who, defendant is informed, was approximately 38 years old, weighed approximately 160 pounds and is five feet ten inches tall; and that when plaintiff advanced on your defendant, he was at every disadvantage from a physical standpoint, as he realized, and had previously attempted in every reasonable manner to get plaintiff to leave his place of business peacefully and it was because of such advances, threats and advantages from a physical standpoint that your defendant used the handle of the hatchet to punch plaintiff in the hope of keeping him from grabbing your defendant, as hereinbefore alleged.
"Defendant shows that throughout the affair plaintiff herein was the aggressor and the cause of the difficulty and as such is not entitled to recover any amount whatsoever in this suit."
On these issues the case was tried below and judgment rendered for plaintiff in the sum of $250 with legal interest from judicial demand until paid and defendant is prosecuting this appeal from that judgment. Plaintiff has answered the appeal praying that the judgment be increased to the amount of $1,500, plus $34 paid by plaintiff for medical expenses and services.
Plaintiff's testimony conformed to the allegations of his petition; that he courteously asked defendant to pay him one dollar on the account due his employer and that defendant became angry and said he did not pay collectors; that he then looked away and as he glanced back he saw defendant was about to strike him with the blade of a hatchet, and he threw his hands up to ward off the blow. That he had not been asked by defendant to leave the store and had not moved from where he first engaged in conversation with defendant; that defendant told him to let Mr. Leon Hammonds come and collect the bill and that he told defendant Mr. Hammonds did not collect. That defendant then walked from behind the counter and struck him with a hatchet and told him to leave the store, which he did.
According to plaintiff's testimony there was no provocation for the attack by defendant on him and, if this were true, the case would be simple but, unfortunately for plaintiff, no witnesses corroborated his testimony. Not even the eyewitness he placed on the stand, and we are convinced that plaintiff's testimony as to what occurred before and at the time of the affray is not correct. Defendant's testimony, which is in accord with the allegations of his answer, is corroborated by all the other witnesses who were in the store at the time, including the witness placed on the stand by plaintiff. We therefore accept defendant's version of what occurred before, at the time and after the affray as the true facts.
Plaintiff was a collector for the Monroe Furniture Company, Ltd. He is approximately 38 years of age, 5' 10" tall and weighs 157 pounds. The defendant is 64 years of age, his weight or height not being shown. He operates a grocery store in the City of Monroe, Louisiana, and has been so engaged for a number of years. He is a duly elected member of the Ouachita Parish Police Jury. Defendant's reputation for honesty is not attacked.
The front door entrance to defendant's store is in the center. The counter consists of showcases arranged in the shape of a horseshoe opening only at the back. The cash register sits on the counter to the right of the front door as one enters. On the outside of the counter and to the left of the front door as one enters, were some crates of oranges and other fruits. The hatchet used in the affray was lying on or near these crates, having been previously used in opening them.
Although it is not made clear by the evidence, we gather from it that defendant's wife had purchased goods of some kind from the Monroe Furniture Company, Ltd., and owed it a balance of $15, which she had agreed to pay at the rate of $1 per week and the first installment was due. When plaintiff reported for duty on the morning of April 23, 1941, this account with others was given him for collection. About mid-afternoon of that day plaintiff entered defendant's place of business for the purpose of collecting the dollar owed by defendant's wife. At the time defendant was at his cash register talking with a salesman. Plaintiff went back near the *Page 92 
heater and remained there a short time until the salesman left. He then walked up to where defendant was at the cash register, defendant being behind the counter and plaintiff on the opposite side. Defendant testified as to what occurred from that time on and is corroborated by all the other witnesses. We will therefore quote his statement as he gave it as the true facts:
"A. Well, he told me that he had come down to collect a bill. I knew my wife owed the bill but at that time it never entered my mind who he was collecting for. I just told him that I was sorry but I wasn't able to pay him anything on it that day, and I said, — `Who is the bill for?' And he said, — `The Monroe Furniture Company'; and I said `I am sorry that I haven't got anything to pay on it this evening.' He said `They sent me down here to collect it.' And I said, `I am sorry I haven't got it, you can come back some other day, tomorrow or any day, or I will fix it with the Monroe Furniture Company; I have always done business with them and I can fix it.' And he says, `No, they sent me down here to collect this bill', and I says, `I don't think they made you come down, you go to the telephone and call them and they can send you back down here on any other day and I will take care of the bill satisfactorily to them.' No, he wasn't going to call them, he was sent down there to collect. I says `You can't collect it this evening'. I says, `I will tell you what to do, Mr. Hammonds buys groceries from me; he is down here every Saturday night — you turn it over to Mr. Hammonds and I will make it right with Mr. Hammonds'. And he says, `No, Mr. Hammonds aint no collector; they don't allow him to collect.' I says, `Well, some of you will have to come back and get it'. He says, `No, they sent me down here to collect it'. I says, `Well, I can't pay you this evening, now go on out of my place of business and don't bother me'. And he says, `No, I ain't going, I am going to collect this bill'. He said, `No, they sent me down here and I have got to have this money this evening' and I says, `You can't get it, just go on'. I was standing at the register and he was standing over at the corner.
* * * * * *
"Q. Now, I believe you have stated already that Mr. Sheppard was standing on the left hand side looking out the door, on the outside of counter, and that you were on the inside of the counter on the same side of the building? A. Yes, sir.
"Q. At the register? A. Yes, sir.
"Q. And this conversation, pro and con, which you have previously related, occurred while you were in that position? A. Yes, sir.
"Q. Now then, after you had had this conversation, what did you do? A. He kept on insisting that I pay it and he says: `You got no business making contracts unless you are going to live up to it', and I said: `I have no contract', and he run up and jerked a piece of paper out of his pocket and laid it down, and I says: `I still didn't make any contract; that is my wife's and I will pay every dime of it, it is good, but I can't pay it this afternoon.'
"Q. What did you do then? A. I turned around and walked away from him and told him to get on out and let me alone and attend to his business, that I was trying to attend to mine. I turned away from this McCaskey register and went on out; he was standing there by the door, and I leisurely walked around by the window on the other side of the store — he was standing on the other side of the store — and he says: `I have got to get this money and get on out of here'. And I says: `Get it and get on out of here', and he started toward me and when he did I reached and got a hatchet and pushed him right in the face with it.
"Q. Now, when you pushed him, what part of the hatchet did you push him with? A. With the handle; I had hold of the open part; I picked it up by the open part and pushed him with the handle.
"Q. Did you push him on his head? A. I pushed him back; he was right at me and I pushed him back.
"Q. Now, when that occurred, did he ever get a hold of you? A. No, sir.
"Q. What became of the hatchet? A. He threw up his hand and hit mine and the hatchet went through a show-case.
"Q. What happened to you then? A. Well, Mr. Stovall ran up behind me and grabbed me with both arms and pushed me back in the back end of the store.
"Q. And what happened to Mr. Sheppard? A. He stood right in the door. He started back right here, back right in the door and he stood right there.
"Q. How long did he stay there? A. After I got back in the back of the store I *Page 93 
told Mr. Stovall to turn me loose and I walked up into that enclosure of the checking counter and he was still standing in the door.
"Q. How long did he stay there? A. He stood there wiping his head and he says: `That is all right, you hit me and I am going to make you pay for it.' And he says: `I will dare you out of the door'.
"Q. What did he do? A. He went out to the side of his car and opened the door and he walked on around on the side and jerked his coat off and says: `If you will pull your glasses off, I will which (whip) you to death'.
"Q. Where did you go from there? A. I was standing on the sidewalk; I told him I didn't want no trouble with him — I says: `I don't want no trouble with you, the best thing you can do is to get in your car and leave.' And he says: `All right, I will leave, I will catch you away from that store and beat you to death'.
"Q. Was there any reason for him coming over to where you were instead of going out of the door just before the affray? A. No, sir; unless he intended to jump on me.
"Q. Was his manner and motion such as to indicate that was his intention? A. I thought he was.
"Q. Did you do all in your power to avoid an altercation with him? A. I think I did. I begged him and asked him to get out, I didn't mistreat him. He said he wouldn't do it; he said he was going to have to have that money.
"Q. Now, they have charged in their petition, Mr. Causey, I believe, the best I can recollect it, that you advanced on him with that hatchet and hit him with the hatchet part of the hatchet, did you hit with the hatchet part of the hatchet in any way? A. No, sir.
"Q. Did you have the hatchet before he got to you and advance? A. No, sir, I did not.
"Q. Where was the hatchet? A. Laying in the window where we had the affray.
"Q. And as I understand from the testimony here there is just an aisle between the corner of the show-case, where the fruit is kept in the window, and the front of the show-case on that side? A. That is right."
 Cross Examination
"Q. What made you think Mr. Sheppard was going to jump on you? A. I had asked him to leave and he had said he was going to get that money before he left there, and I told him to get it and he come tearing toward me.
"Q. You mean he started across the floor at you? A. He came across the floor toward me past the door.
"Q. You were walking around toward one corner and he walked around the other side? A. He was standing around there to the left of the door, and one door was shut and one open, and I was at the back end of the door that was shut, right where the window is, and he came from over on the other side over to where I was.
"Q. Now, when you hit or pushed Mr. Sheppard, he still had these papers, the collection cards, in his hand, didn't he? A. I don't know whether he did or not.
"Q. You didn't notice that? A. I didn't notice that, no, sir.
"Q. After you hit him, you say Mr. Stovall grabbed both of your arms? A. Yes, sir; he grabbed my arms and pushed me toward the back of the store.
"Q. Did anybody grab Sheppard? A. No, sir.
"Q. Or pull him away or anything? A. No, sir."
Plaintiff contends that the facts as we find them make out a case for him under the jurisprudence of this State and relies chiefly upon the cases of Womack v. Hotel Frances, Inc., La.App., 151 So. 128; Antley v. Davis, La.App., 199 So. 450; Newman v. Southern Kraft Corporation, La.App., 197 So. 197; McVay v. Ellis,148 La. 247, 86 So. 783; Harvey v. Harvey, 124 La. 595, 50 So. 592; Derouen v. Fontenot, 8 La.App. 652.
Defendant contends that the facts as we have found them to be do not under the jurisprudence of this State make defendant liable to plaintiff in any amount and he relies principally upon the following cases: Oakes v. H. Weil Baking Co., 174 La. 770,141 So. 456; Welch v. Van Valkenburgh, La.App., 189 So. 297; Landry v. Himel, La.App., 176 So. 627, 629; Di Giovanni v. Brodtman, 14 La.App. 34, 35, 128 So. 665; Lide v. Parker, 6 La.App. 648.
In Antley v. Davis, supra, defendant assaulted plaintiff after running him down. There was no provocation by defendant toward plaintiff at the time of the affray. Plaintiff had provoked defendant's wife by his conduct outside of the presence of *Page 94 
defendant sometime prior to the time defendant attacked plaintiff.
In Newman v. Southern Kraft Corporation, supra [197 So. 199], we found that plaintiff was not the aggressor and had committed no act to provoke the assault on him by defendant. In that case we quoted the following extract from the written opinion of the trial Judge: "The Court is impressed with the fact, and it is the opinion of this Court, that what really provoked this difficulty was not any fear on the part of the watchman but, to use the term, that his vanity had been hurt and that he resorted to this force in the presence of the various other people to stop this plaintiff as he continued on the way toward the superintendent after he had whistled to him to stop. In other words, that he used the blackjack to enforce his order to the plaintiff."
In the case of Womack v. Hotel Frances, the plaintiff had done nothing to provoke the attacker. Defendant was angry because of an affray with one of the plaintiff's companions and attacked plaintiff without cause.
In Derouen v. Fontenot, supra, the court found that defendant was intensely provoked when he saw plaintiff slap his son. Defendant came upon the scene when the fight occurred, after his son had been slapped by plaintiff. He sought plaintiff out and after threatening him, assaulted, slapped or struck plaintiff and the fight continued. The court found under these facts that defendant was the aggressor.
The facts in McVay v. Ellis, supra, differentiate it widely from the case at bar.
In Harvey v. Harvey, supra, the court said that provocation consisting of mere abusive words, however much they may be calculated to excite and irritate, will not justify assault and battery, but in a civil action such provocation may go in mitigation of damages. In this case a lady was assaulted and struck by a man.
The settled jurisprudence of this State is to the effect that one who provokes a difficulty with another cannot recover damages for injuries inflicted upon him as a result thereof even though the conduct of the one who inflicts the injuries was not justified in law. Oakes v. H. Weil Baking Co., supra; Lide v. Parker, supra; Vernon v. Bankston, 28 La.Ann. 710; Johns v. Brinker, 30 La.Ann. 241; Bankston v. Folks, 38 La.Ann. 267; Massett v. Keff, 116 La. 1107, 41 So. 330; Bonneval v. American Coffee Company, 127 La. 57, 53 So. 426; Welch v. Van Valkenburgh, supra; Landry v. Himel, supra; Di Giovanni v. Brodtman, supra.
If this were not the law a strong young man might easily provoke a difficulty with an aged man without fear of any great bodily harm, for the sole purpose of collecting damages. In cases of this kind it is almost impossible to find two with identical facts and the facts peculiar to each case necessarily are determinative of the issue.
In the case at bar defendant was in his own place of business conducting it in his usual manner when plaintiff approached him in an effort to collect a dollar due by defendant's wife and he was told that no payment could be made on that day, to come back later or send someone else back at a later date. Plaintiff was requested to phone his employer if he had any doubts about it being all right not to collect on that date. Plaintiff was determined to collect from defendant before leaving and continued to demand payment, charging defendant with making contracts and not living up to them. He was asked by defendant on several occasions to leave the store, being told by defendant that he was busy and did not care to be bothered any more. Plaintiff did not leave but continued to insist on payment. Defendant was upset by plaintiff's persistence and annoyance and turned and walked away from him. He went out from behind the counter at the rear of the store and walked up the opposite side of the store from where plaintiff was, no doubt hoping plaintiff would leave his place of business and cease his uncalled for annoyance but instead of doing this, plaintiff remarked to defendant, — "I have got to get that money and get out of here."
This irritated defendant further and he replied: "Get it and get out of here".
Certainly this was not an offer by defendant to pay plaintiff.
Our appreciation of the above conversation is that defendant meant, — "If you are going to take the money by force, then do it and get out of here".
Defendant had told plaintiff on numerous occasions that he could not make a payment on that day. From a man of defendant's standing in the community that should have been enough for plaintiff to know that he was not going to make any *Page 95 
collection from defendant on that day unless he did it by force. When defendant replied, — "Get it and get on out of here", plaintiff started toward defendant. Defendant was at that time on one side of the store and plaintiff on the other. Plaintiff went over to defendant's side, passed by the front door, which he should have gone out of, and went directly up to defendant. When he was near, defendant picked up a hatchet from the fruit stand and punched plaintiff on the forehead with the butt end of the handle, causing a slight cut of approximately one and one-half inches in length. No serious injuries were inflicted on plaintiff. They went together after that and were separated and plaintiff invited defendant to come out of the store and continue the fight.
Just why plaintiff advanced on the defendant is not known. Plaintiff could have told us but he did not see fit to tell any of his part of what occurred there. Defendant testified that he thought plaintiff was going to attack him. Plaintiff passed directly in front of the front door of the store when he left where he had been standing and advanced over to where plaintiff was. What he intended to do we do not know but he did not intend to leave the store at that time.
We are of the opinion that the force used by defendant under the circumstances, considering the difference in the ages of plaintiff and defendant, was no more than was necessary. Under the facts of this case, defendant cannot be held to be the aggressor. The difficulty was provoked entirely by plaintiff in the unreasonable and insulting attitude he displayed in trying to force defendant, an elderly man, to make a payment on his wife's account. Plaintiff had made himself a nuisiance, was annoying defendant greatly and preventing him from attending to his business. Certainly defendant had the right to ask him out of his place of business and if he did not get out, defendant was within his legal rights in putting him out. He could use, however, only the force necessary for that purpose. While it is true defendant did not attempt to eject plaintiff by force, the same rule would apply when defendant used force to prevent plaintiff coming any nearer to him after he had ordered him to leave the store.
The affray having been entirely provoked by plaintiff, it is our opinion that under the jurisprudence of this State he cannot recover for any damages caused him by the affray.
The judgment of the lower court is erroneous and is now reversed, and the demands of plaintiff are rejected at his costs in both courts.